Case number 14-7017, Henry Harman International Industries, Inc., securities litigation. Arkansas Public Employees Retirement System, individually and on behalf of all other similarly situated appellate, Chiyo-Lin Kim, and City of Boca Raton General Employees Pension Plan, on behalf of itself and all other similarly situated, CA-07-2175, versus Harman International Industries, Inc., et al. Mr. Toll for the appellant, Ms. Lovett for the appellees. Let's wait until the courtroom is cleared. All right. Good morning. Thank you, Your Honors. I'd like to reserve three minutes for rebuttal. May it please the Court, Stephen Toll for the Arkansas Pension Fund and the class of investors that Arkansas seeks to represent. We have a narrow focused appeal here, Your Honors, limited to three statements. I'm going to summarize the statements quickly, focus on the four discrete issues for your consideration, and then argue those points. And the timing of these statements is critical in terms of the dates and the fiscal year the company was in. The first two statements, the issue is whether they're forward-looking or current. The first one was April 26, 2007, where the company discussed its plan to reduce the PND, the personal navigation devices inventories in Europe. They said they planned to reduce them to a normal level by year-end, which is June 30. It's a June 30 fiscal year. It was already at the end of April, 10 months into the year. And that they planned their forecast sales of 618,000 units for fiscal year 07. And the key language is, and they said, and that plan is proceeding. Then they went on to talk about what the inventory would scale down to in the next three months. The second statement is the September 27 statement, which is right at the end of the first quarter of the next fiscal year. And in describing the first quarter sales, there are only three days left. The company talked again about the PND business and said, we continue the growth and expansion of that business primarily in Europe. The third statement, which is not an issue of current versus forward-looking, is really whether the statement is material or immaterial puffery, as the district court found, is from paragraph 82 of the complaint, a statement in the form 10-K for the fiscal year ending June 30, dated August 29. So this is a statement, very important, retrospectively describing the year that just finished, not a future projection at all. The company said sales of aftermarket products, particularly PNDs, were, in the key language, very strong during fiscal year 2007. So the issue is, first, can the court, four issues before this court, can the court consider for the first time on appeal whether the first two statements were current or forward-looking? If the court says no, then we waived it by not contesting it below. You would then look at them as forward-looking and then see if they were accompanied by meaningful cautionary language, which is the only way they could be exempt from liability. And if you find they're not, as we contend, you should reverse. Also, the question raises whether you should consider state of mind in making that determination, which is kind of a sub-issue. If you believe yes, that you can consider this on appeal, which I believe you can, then it's up to you to decide if those first two statements are current or forward-looking. If you believe they are current, which we believe they are, given the language that was said talking about current conditions, again, I think you must reverse on those two statements. And you need not even get into all the nuances of forward-looking statement and meaningful cautionary language. But didn't you argue quite affirmatively in the district court that these were forward-looking statements? You put them in the section of your brief characterizing them as forward-looking statements. You've argued that the safe harbor applied because you thought that that's the way you had to argue, because they were forward-looking. And how can we say that that's not a forfeit argument, that they're not even forward-looking statements? What can you point to in the district court? Your Honor, you're absolutely correct, Judge Pillard. But I would say look at the less-nesty decision Judge Rogers wrote. Judge Henderson was on the panel. And this court has a lot of discretion on whether to consider an issue for the first time on appeal. And the various factors are considered in order to prevent manifest injustice, exceptional circumstances. If it's a straightforward legal issue to be determined and resolved, which is now fully briefed on appeal. And this area of current versus forward-looking has just been an evolving area. You can tell from the briefs there are decisions going both ways on statements that are present tense, whether it's current or forward-looking. And there's a lot of confusion. You're absolutely right. We did argue the other way. And if the court believes we cannot argue now, we waive that right, then I would go into the other argument. If, in fact, you believe within your discretion. Because, again, this is really a procedural rule to promote the ends of justice, not to defeat them. And the court could give some guidance to the district courts on what is current and forward-looking. And if you look at the two statements, and I can't tell what went into our mind back in 08. Remember, these briefs were written a long time ago, Your Honor. There's a tortured history here. And what we were thinking and where the law was on current and forward-looking. There's been a lot of development. But when they say the plan is proceeding, just to me, it's a clear description of current business, whether they will meet the forecast of reducing inventory and selling units that they had said before. It was not a new projection. Nothing about it was forward-looking. And I believe it is current. The same way in September when they talked about we're going to continue the growth and expansion of P&D sales, they were talking about something that happened that quarter. So your strongest argument, then, for the exception is the fact that the law was unsettled and evolving. And, therefore, in those extraordinary circumstances, we should hear an issue that the district court expressly stated that the parties agreed? Yes, Your Honor. I mean, it's a very high burden. Your Honor, I confess it is. And I'm prepared, really, to go to the other arguments. But I think you have the discretion to consider it. And if you do, I think you'll find they're current. And can I explain what we did six years ago in the briefing? Assuming it's forward-looking, is the position that the failure to caution was a failure to caution about the dangers of excess inventory? Because in the very statement that you quoted, you talked about planning to reduce inventory to normal levels. So the statement itself includes some caution, if you will, about burdensome inventory. And so I guess I'm ‑‑ what's the caution that they should have made that they didn't make? Okay, Your Honor. What they did make, and I'll get to your question. What they did make, and we emphasize repeatedly, and this is why I say they really were boilerplate and not meaningful cautionary statements. They made statements that any company in America could talk about any product. They said the market's extremely competitive. There could be pricing pressure. There could be shifting consumer demand. We're going to compete with competitors' products. They said it three straight years in a row with no changes. Your Honor, what they should have said is we have serious problems with obsolete inventory that we don't think we can sell. Your comment about what they did say is planning to reduce it is not a cautionary statement. It is their plan of what's going to happen over the next few months. A cautionary statement would have been, and again, the facts are important here because we have good confidential witnesses who told us, who work there, and told us all about the obsolete inventory and their inability to sell it. The company knew it. They didn't tell the market. There's not one word about obsolescence in any of their warnings anywhere. So I think that's why, and again, whether we waive the argument or you find that it's forward‑looking. Go ahead. They didn't use the word obsolescence as such, but they did everything short of that, didn't they? I don't believe what they said, Your Honor. Give the market and the investors an understanding that this is or could be a serious problem, that we've got excess inventory we can't sell because it's out of date. They didn't really say anything like that. They talked about we may be delayed in developing new products. Well, that doesn't mean you can't sell the old products. One of the problems was they were developing new products, and they contributed to their own obsolescence of their own products because they weren't the latest model, right, of Harmon. You are correct, but, Your Honor, just because you developed a new model, think of the Apple 4 and 5. They developed the Apple 5. People were still buying the 4 and 5. I see that you're arguing against yourself because I was thinking that, as they're telling their investors, we've got to keep up with the competition, we've got to be cutting edge, we've got to keep developing new models, there's a tension there because, as they develop new models, they render their inventory more and more obsolete, and, therefore, they're failing to balance. And you're saying, oh, well, they're not actually rendering their inventory obsolete. I don't think you can make that leap, Your Honor, that as you develop a new product, the older one will not sell. You sell them at less money, and you sell them. There's a big difference between, you know, lots of people develop new products all the time, and they still sell the old ones. So the problem is that they didn't divulge that the inventory that they said they had ready to go into their new strong sales effort was older and, therefore, would have to be sold at a discount? They did not, and, in fact, Your Honor. That's the problem? That is, yes. They refer to inventory, but we could think that it's the fancy, expensive, full-priced new inventory. Either they had to sell it at a huge discount, or they couldn't sell it at all. Well, that's what I was going to get at. I mean, standard business would be you get a new model, and you're going to sell the older ones at somewhat of a discount. And the older they get, the discount presumably will be higher and higher and higher. And then, ultimately, you may have to discard some and just take a loss and let it go at that. But that's standard business operation, isn't it? Yeah, except, Your Honor, they didn't tell the investors that. They didn't give the investors that warning. And, in fact, one evidence we have where they had a product at $350 per unit. They finally tried to sell it at $240, and they couldn't sell it. When they finally sold it, then it got returned in a few months because it was obsolete. Well, they say, for instance, in this first statement you're quoting, you're relying on, is that the inventories in Europe had grown substantially and that competition was fierce and we've got to work hard, all that sort of stuff. And that's why I say the law seems to be developing in the area that maybe I'll just jump ahead and say, you know, you don't have to say everything so long as you're giving what I'll call the hints that a reasonable investor or potential investor might think about. Well, you're close, Your Honor, but I agree you don't have to say exactly. But the test that's pretty much settled in the courts is it has to be substantive and tailored, not boilerplate, and significantly similar to what actually happened. And so it's a three-year repeat that's key here. Yeah. I mean, they repeat the same thing three years. And the evidence in the record has to be taken as true from all the confident witnesses is how obsolete everything was and they couldn't sell the product. They never told the market that. I'd like to move to the other argument, Your Honors, which I think is a very powerful one, very interesting, this language of what does very strong mean and whether it's what's called puffery or immaterial, according to the district court, or whether it's actionable. Again, this is critical. This statement was made. It was not about the future year. It was about the year past. It was describing the year that just completed. So lots of times you see what they call puffery, corporate optimism, we expect everything's going to be great, we're an amazing company. All those types of statements are different. We are talking about a past event here. They were describing in August what occurred in the year that ended in June. And what's critical here, there are two Supreme Court decisions that really determine this case, I believe, in our favor, Your Honors, because puffery is basically about immateriality, as the district court said and other courts have said. And the question is, is this statement material? Now, very strong in a different context, someone might say, is it material? I think really facts are very important here because materiality is a mixed question of fact and law. But the Supreme Court in the unanimous decision, TSV v. Northway in 1976, written by Justice Marshall, talked about what it is to be material. It's when an omitted fact is material, if there's a substantial likelihood a reasonable shareholder would consider it important, it must have assumed actual significance in the deliberations of a reasonable shareholder. There's a significant likelihood that disclosure would have been viewed by a reasonable shareholder investor as having significantly altered the total mix of information. I'd like to go back, Mr. Tolt, to the forward-looking statements and what the appropriate legal standard is there. Because, as you know, there's a certain amount of different approaches taken among different courts, and our court has not yet addressed the question. We have the Second Circuit and the Ninth Circuit suggesting that awareness of historical fact contrary to states of affairs highlighted in cautionary language is relevant under the non-scienter prong of the safe harbor. And then we have other courts saying, no, there's scienter in one prong and not in the other. And so what do you make of that and what rule do you think we should adopt? Well, I think it is clearly logical and within the purposes of the statute. Again, the underlying purpose of the securities laws is the protection of investors to look at the state of mind, the knowledge of the defendants. I understand the arguments and, again, the word. It's disjunctive and all of that. But you can still look at the state of mind in considering whether it's a meaningful cautionary statement. And if they know something that is not what they're telling the public, how can you say it's meaningful? So I think you have to be able to consider what they knew. I mean, if we had no facts here, Your Honor, you know, we'd be dead. But we've got a lot of facts here saying they knew they had obsolete inventory they couldn't sell. If that wasn't in the complaint, I'd say, well, you know, how am I going to argue that it wasn't meaningful? But we have facts to show it wasn't meaningful. So I think the court can take that into consideration. I think it's fact-driven. And it's not that that caution or failure to caution itself becomes an actionable statement or omission under the securities laws? No, correct. No, we do not contend that the risk disclosures themselves are fraud. But that they don't qualify for the safe harbor because they don't count as reasonable cautionary statements. Correct, Your Honor. Back to Northway. Is there an opinion that you would look to to tell us, like, follow so-and-so's approach? I think the best ‑‑ actually, the district court here in the Iridium case, I believe, but the Second Circuit in the Slayton case and the Seventh Circuit in the Asher case, I think are the two most important opinions on really going through and assessing what the right result should be and what the court should consider. Back to Northway for a second. And the word there that was at issue was the word substantial, just to give a context of what we're talking about here, because it's so easy to look at very strong and say, oh, what does that mean? But the Supreme Court found the word substantial was a word that could be tested at material in that setting, whether there was a substantial premium offered, as was alleged in that case. That was 1976. The next critical decision from the Supreme Court is the well-known Virginia bank sheriff's case in 2000 ‑‑ I'm sorry, 1991. There, the Supreme Court was confronted with the issue of whether a statement of reason, opinion, or belief can be material. And the court with a resounding answer of yes. And what's interesting there, again, the language being used in that case is whether the merger was fair, and that's the word that was critical, fair, to the shareholders, and whether the value was high. Those were the words allegedly misstated. And the Supreme Court said, yes, words like that that are kind of conclusory, but when they're used in a commercial context, everybody understands they have meaning behind them, and they rest on a factual basis. And the factual basis is either accurate, justifies them as accurate, or they can be misleading, and thus they qualify as material. They even actually cited a D.C. Circuit case in 1976, Dave versus Avery, where a law firm described a merger of whether they'd be worse off. And that was found to be actual by this court. But I think here, again, the facts are so critical. Because the facts here is, remember my ‑‑ the original allegedly forward‑looking statement in April said, we're going to sell 618,000 units by the end of June. They had only sold 300,000 by the end of March. They never told the public how many they sold. Never. They come out in August with their 10K for the year and say, sales of PND, particularly PNDs, were very strong. This now, look at the facts in the complaint. Where's the fact about how many they did actually sell? It's in the complaint, Your Honor. At paragraph 55, and then 56 and 86D. So what they sold, they were short by 200,000 units. That's like a third of the projections. It's not like 2% or 5%. A third. Paragraph 86D says they missed their projections for the year by $85 million, one third of what they forecasted. And then there were other allegations about how they had the large inventory and they knew it and they couldn't sell it and so on. So you're an investor. Think about it. You heard in April, you know, that what we expect to sell by June, 618,000. You're never told what happens. And then you hear in August, we had sales that were very strong. And how about loss causation? You know, also this planned murder didn't go through. That's not even in the case anymore, Your Honor, of the murder. No, but just in terms of loss causation. Yeah, loss causation. These are, this puffery is what caused the loss. Well, Your Honor, there were, again, loss causation, as you know from the Supreme Court's decision in Doar, is a very minimal standard. A corrective disclosure, whether it ties into the misstatement. The corrective disclosure here had three elements, and one of the key three elements were the P&D failures, the inability to sell P&Ds. So it links directly the corrective disclosures in January and February of 08 to the misstatements that we allege they made about P&Ds in 07. And the stock drop was enormous, like 25 points the first drop, seven the second. Now, I'm not, Your Honors, I cannot say, and I won't say if this case goes back, we can collect all those damages because there are multiple things that went into that drop. But definitely from a causation standpoint, at least part of that has been established, and the district court would deal with that. All right, if there are no more questions. Anything else, I think I'm over. We'll give you a couple minutes. Thank you. Ms. Lovett. Thank you, Judge Henderson. And may it please the Court, Tracy Lovett for Harmon. It's clear at this point that plaintiffs cannot prevail without delving into the state of the mind of the defendants or imposing a heightened cautionary statement requirement. I think most telling in this regard is the reply brief. At page 18 of the reply brief, the plaintiff identifies the cautionary statement that would be required as follows, and I'm quoting, there is an extremely high likelihood that much of our P&D inventory will be sold for a loss because they are obsolete. No court has ever required a company to disparage its own products in order to have a meaningful cautionary statement. And no court has ever required such specificity in the cautionary statements. So I think a question for me was, you know, how to begin? How do you begin this analysis of what should a meaningful cautionary statement look like? And to me, I think the starting point is what is the actual risk that was realized? Plaintiffs identify the two corrective disclosures as a January 2008 press release and a February 2008 press release. This is from Joint Appendix 270. Here's what's said in January. This is the risk that was realized. In recent months, this sector has experienced significant pricing pressure affecting the entire industry. That's the January disclosure, the first corrective disclosure, extreme industry-wide pricing pressure. Here's the February disclosure. This is at Joint Appendix page 292. P&D sales fell by 29 million compared to the same period last year. Both P&D sales and margins decreased due to aggressive price reductions by competitors, the delay of new products, and the sale of older products at substantial discounts. Now, I want to stop there because there's a lot of language being thrown around about obsolescence and unsaleability. That's not the actual risk that was realized. The actual risk that was realized, and what plaintiffs say was the corrective disclosure that was accurate, was that the products were sold. It's just for more of a discount than Harmon appreciated at the moment. So what was the end of your sentence? They were sold at a higher discount than Harmon appreciated or anticipated. So it was extreme margin pressure that they knew there would be margin pressure, but it was even worse than they realized. So against those risks, what did Harmon say? If you go to the April 2007 conference call, Dr. Harmon says, and this is Joint Appendix page 240, I had indicated in earlier conference calls that the P&D environment in Europe was not as margin challenged as it is in the United States, but that we could surely anticipate it. There was a reasonable foresight in that observation. In the recent quarter, the European P&D market has become extremely competitive. We are working extraordinarily hard to increase sales and to maintain adequate margins in that environment. Later in the call, and this is at page 247 of the appendix, he's asked a question by an analyst about the pricing pressure and why it's happening. And he's asked, is it because the growth is slowing and there are more people, or is it higher competition? And Dr. Harmon says, it's the former. It's competition. Next, in September 2007, this is at Joint Appendix page 259, Kevin Brown, the CFO, says, and this is something an investor would pick up on. He says, first, we expect automotive sales to increase approximately 15% during the quarter, primarily due to the ramp-up of an infotainment systems program and higher P&D sales. Then he goes on to say, we expect gross profit to decline as we enter mid-infotainment segment and the ramp-up of our P&D business. He's saying, sales up, profits down. What explains that? Pricing pressure. So an investor is picking, he's disclosing, our sales are going up, but our prices are going down, and our gross profits are going down year over year. Finally, in the 2007 annual report at Joint Appendix page 177, they disclose that they are selling new aftermarket P&D products. And there are multiple, multiple disclosures about obsolescence. I think we need to take a step back here, because personal navigation devices seem quaint now that we all have Google Maps on our iPhones. But at the time, this was a revolutionary, cutting-edge product in an emerging technology market. At some level, the risk of obsolescence is inherent in that kind of market, and actually looking backwards, that's what we see today. So that was my question for you. In terms of cautionary language, we have these kind of conceptual pools that are relatively clear. It can't be boilerplate, but it doesn't need to be sort of percentages and chapter and verse and your entire internal business plan and the things that keep the CEO up at night. But it does have to disclose material categories of risk. And my question is, there is a lot in the disclosures. There's a lot of cautionary language about this is a very competitive business, and we have to keep innovating. It's very competitive, but we have to keep innovating. They say it over and over again. I really see separate cautions about we made too many of some of the devices. We've sunk some money into inventory early, and that inventory is going to have to be more discounted. They talk a little bit about inventory, and they talk about the need to stay ahead of the curve. But it seems to me that there's kind of this Scylla-encrypted quality of this industry where you have to have enough inventory to keep up with consumer demand, because obviously you're not going to reap the profits of your innovation if you don't do that. On the other hand, you can't sock away too much inventory, because by the very competitive nature by which they've warned, it's going to become obsolete. And I hear a lot about the competition, not so much about the just-in-time production demands and how they're concerned about that. So let me point you to Joint Appendix, page 371. This is the fiscal year 2006 annual report. I'm going to read quite a bit, because this was the thing that kept me up this question. And here's where I think it is. Here's how the annual report starts. Dramatically changing technology and equally dramatically changing marketplaces dictate more creative and shorter product cycles. Those shorter cycles carry significant challenges and risks. Shorter and more frequent product cycles clearly demand more and newer engineering. They require far tighter controls of cost and no less significantly of time. It is the most demanding and complex challenge to management today. Stay too long with an otherwise attractive product, and management risks the loss of all product that originally generated. Along with that loss of profits, equal dangers, the loss of momentum, the loss of reputation. That's at 371 of the Joint Appendix. It is exactly the risk that you were just discussing. And the date on that? That's the 2006 annual report. So that's going to be, this is where their fiscal year always messes me up. It's June 07. So it's right in this time period. So then the secondary question is, do they have to go further? Do they have to say, oh, and by the way, our inventory is really, really old, and we got a whole bunch of it, and we're going to have to sell it at a massive discount. That's what plaintiffs say. And that level of specificity, product disparagement, even in the Seventh Circuit Asher decision that plaintiffs cite, they say you don't have to go that far. You don't have to hand your competitors a win. And there's a secondary reality here. But you can do that without product disparagement, and you can do it without the invective that maybe even plaintiff's template says, you know, we were a little over-exuberant in producing the, you know, 1.1 version, so we will have to sell at a discount on those, and we've taken that into account. And moving forward, we've made our production schedule more nuanced and leaner. That seems pretty standard in terms of disclosure. The second problem is you don't know how much the product is going to sell for until you sell it. And these pricing pressures, the extent of the pricing pressures, did not materialize until the second quarter of fiscal year 08. That's when you can't move the stuff. The Paragon case, which is what they're talking about, is June, and they sold that, and they sold it at a decent margin, and that actually did not impact the bottom line. And your gross profits and sales go up over that quarter. It's not until you get to the second quarter, fiscal year 08, and they're selling it, that you get the actual market price realization, and you can't worry about that. I'm just following entirely because I thought the complaint pleaded that they came in 200,000 units short of their anticipated sales and 85 million short of their anticipated. That's an internal projection, right? They missed their internal, but they're knocking their investors all along the way, hey, look at our good internal projections. Well, in one call. And the reality is they're knocking it out of the park in sales. Up until fiscal year 08, second quarter fiscal year 08, the sales of P&Ds are actually rising. They're going up considerably. And so these statements – But not as fast as they told investors they planned them to go up. But they have – true. They did miss their internal projections. So then the question becomes, do they have a duty to correct the forward-looking projection? The statute answers that for you. It's subsection D, 15 U.S.C., 78 U.5, subsection D. Safe Harbor says there is no duty to correct an incorrect forward-looking statement. But except when you turn around and you engage in what you characterize as puffery and say, and, hey, we were telling you we were going to sell 618,000 last year, and, wow, we ended up with really strong sales. Relative to what? The investor thinks relative to what I was told. Okay, good on that. Check. False. Right? Well, the actual statement of puffery – and, again, I think this is where reading what was actually said is key. What's actually said is that automotive sales are – the sales of aftermarket parts is very strong, including P&Ds. And, you know, first, that's actually – if you look at it as automotive sales – Particularly P&Ds. Let's look at what was actually said. Particularly P&Ds. So I'm going to step back and say, first, our position is that this is just run-of-the-mill corporate optimism. CEOs, CFOs say this stuff all the time. Investors don't make investment decisions based on the optimism of management. And that's – there's a long – But isn't optimism if they're talking retrospectively about a year that's already occurred and what benchmark do they have but what the corporate spokespeople told them through the year? What are our targets for profit and what are our targets for sales of these kinds of devices? And then, end of the year, we hit it out of the park on that particular kind of device. And then the question is, does an investor rely on that? And I think the answer to that, and that's the copper case, is no. They're not going to rely on that. They're going to rely on the actual projections. But I think you've hit the ambiguity on the head. You don't know what the benchmark is. And because you don't know what the benchmark is, a reasonable investor isn't going to make an investment decision not knowing what the very strong is about. It could be about what's on page 176 of the joint appendix, which is year-over-year sales. And in that context, it's true. So because you don't have the benchmark, and there's a big gap in time between what you're talking about with the sales projection and this, maybe the more logical inference is that they're talking about year-over-year sales. And those were very strong. But because you don't have a benchmark, that's why you can't hang materiality on this kind of puffery. I do want to talk about this. I do think this is where probably what for you guys would be the interesting legal question is, how does knowledge come into the safe harbor? And we briefed this extensively. And all I can say is I think that every indicator of statutory construction indicates that you do not look at the state of mind. We explain at length in the brief why you have a disjunctive. It's in the disjunctive. Everybody agrees. You have to give each part of the safe harbor meaning. So this safe harbor has to exist. It has to be able to operate in a world where you have a false and misleading statement, you have actual knowledge, and you have materiality. And so if you start importing CNTR into the safe harbor, it doesn't have any sense of independent operation. And, you know, there's a lot of legislative history flying around, but the legislative history, and this is the joint conference report, on this safe harbor could not be any clearer. This is page 44 of the conference report. The conference committee specifies that the cautionary statements identify important factors to provide guidance to issuers and not to provide an opportunity for plaintiff counsel to conduct discovery of what factors were known to the issuer at the time the forward-looking statement was made. The use of the words meaningful and important factors are intended to provide a standard for the types of cautionary statements upon which a court may decide a motion to dismiss without examining the state of mind of the defendant. But the conference report also says a cautionary statement that misstates historical facts is not covered by the safe harbor. There is no misstatement of historical fact in these statements. And this is, I haven't gotten into forward-looking because we believe this is waived, but if you really want to look at these statements, the first statement, the April 07 plaintiff's proceeding statement, there's no, it's disclosed, and this is joint appendix page 250, it's disclosed in that call that they sold 300,000 units and they disclosed their plan of 618. Importantly, there is no allegation that the 300 number's wrong. There's no allegation that the 300 number was not to plan. So everything, every current fact is correct. What plaintiffs are attacking is the, are you going to make the 618? And that's all the forward-looking parts of it. It's not in the statement. The September 07 statement. So you don't dispute that if there were a statement of historical fact, that that's completely appropriate under the safe harbor as the SEC reads it and as the. I mean, we would, this is not our primary argument, but we do make the argument that if you look at the definition of forward-looking statement, depending on which one you're in, the first one says a statement containing. And so that suggests, that could be read to mean so long as the statement contains a projection, the whole statement is covered. But I don't think you need to get there because there's no dispute in this case about the current fact. It's all the forward-looking that's being. And that's what distinguishes this case from the Maker case, for example. In Maker, you have channel stuffing. You have, which is essentially they're selling products, they're sending products to people who haven't ordered them, right? They're sending their customers this stuff. And they're booking it as revenue, which is fraud. And it violates GAAP. And it's in that context where they say, look, you can't say you're still going strong when you're violating GAAP and your sales numbers are affirmatively wrong because your channel's stuffing. You can't do that. That's not the case here. The 300,000 number's correct. And it's on plan. And I want to say this very quickly because we did not go to this, we didn't discuss this at length in our brief. The September 7th call, context is key here. This is a guidance call. This is not an earnings report call. So this is Joint Appendix, page 259. Kevin Brown says, we have not yet completed the first quarter. Therefore, I am reviewing estimates, right? So everything he talks about is a projection. And when he gives the $950 million sales number, that is an estimate. The growth question comes up when the analyst asks, what's driving? I can get the actual quote from you. The analyst asks, what's driving this? Why is your sales number so high in the first quarter? And then he states the assumption underlying the estimate. And the assumption is we continue the growth and expansion of that business, that's the P&D business, primarily in Europe. So he's asked the question, and I think here you've got to read the whole exchange between the analyst and Mr. Brown, because the analyst is asking what's the assumption underlying this estimate, and then he gives it. That falls squarely within the safe harbor. Forward-looking statement is defined to include any statement of the assumptions underlying or relating to any statement described in the previous subparagraphs, which include projections and estimates. So, again, I get back to the only way you run into a problem is if you start examining the state of mind. And the statute tells you, Congress tells you, you don't look at state of the mind. You should be allowed to just read the statements and see if you think that they are identifying risks. And I see I've more than used my time. You've been so generous with me today. But I would point out that plaintiffs keep saying that the Seventh and the Second Circuit have decided this issue. They have not. The Second Circuit in Slayton is dicta, and if you look at 604F3rd772, it says we need not cite that. Right. No, we realize that. It's a discussion. It's a useful discussion, though, given that there are not very many detailed discussions. What about the fact that the SEC seems to read it the way Judge Katzmann said it was susceptible of being read in the dicta in Slayton? I think you cannot have an agency interpretation that flies in the face of clear statutory language. I think that's sort of a mistake. So you don't have any indication that that's not still their position? I don't have any indication. I'm more than happy to take a look at it and submit a brief to the court if you think that would be helpful. But you rarely get legislative history this clear, and you rarely get language this clear. And you put them together, and I don't think there's much room for state of mind in the analysis. All right. Thank you. Does Mr. Toll have any time? Okay. Why don't you take a couple minutes? I'll be very brief. I want to focus on one fact issue, because, again, I think this materiality issue on very strong is a fact and law question. My opposing counsel said this 200,000 shortfall in units was an internal projection. That is wrong, Your Honor. Paragraph 55 of the complaint and 86D of the complaint. Talk about that was actually an internal operating report for July of 2007. That's after the year is over. So that is an internal document reporting on how bad the results were for the year. It was not a projection ahead of time. Those were the final results. There's a huge shortfall. They try to say very strong may have meant it could mean referring to prior years or prior quarters, but, again, put yourselves in the shoes of a reasonable investor of what they were thinking after they were told they would make 618,000 units. They didn't come close. They still said sales were very strong. When you speak, you have to speak truthfully. You can't omit material facts. I think the Supreme Court in the Northway decision said, when you have critical nature of information misstated or omitted, there will always be doubts. And in view of the prophylactic purpose of the statute, the Securities Act, those doubts are resolved in favor of who the statute is designed to protect. And here I think the investors were clearly misled by that statement. And with regard to meaningful cautionary language, I'll just go to Judge Flaherty's last statement about what they could have said. I think it could have easily said we have a real risk. We've built up inventory. We may have to sell at a larger discount or not at all. That's our risk. It was never said, and you could not understand that from what they did say, which was the same thing every year. Thank you, Your Honor. All right.
judges: Henderson, Rogers, Pillard